COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| | § | No. 08-20-00244-CV |
| IN THE INTEREST OF | § | |
| | § | Appeal from the |
| A.L.H. AND C.M.H., | § | |
| | § | 109th District Court |
| MINOR CHILDREN. | § | |
| | § | of Andrews County, Texas |
| | § | (TC# 21,497) |
| | § | |

**O P I N I O N**

Appellants[1] C.H. ("Chad") and A.I. ("Amy") appeal a trial court judgment terminating

parental rights to their joint children A.L.H. and C.M.H.[2] We affirm the judgment of the trial court.

---

[1] We refer to the parties using pseudonyms. *See* TEX.R.APP.P. 9.8.

[2] Chad is the biological father of three children: D.J.W., A.L.H., and C.M.H. These children, however, have two different mothers. "Andrea" is the mother of D.J.W., while "Amy" is the mother of A.L.H. and C.M.H. The trial court's judgment terminated Chad's parental rights as to all three of his children. Both Andrea and Amy also had their parental rights terminated in the same proceeding. Distinct from Chad and Amy, Andrea stipulated in the trial court to termination of her rights to D.J.W. and she did not attempt an appeal of the termination judgment. Like Chad, Amy not only contested termination of her rights, but she also appealed the trial court's termination judgment against her.

This appeal docketed as Cause No. 08-20-00244-CV deals with *both* Chad and Amy's appeal of the judgment terminating their parental rights to their shared children A.L.H. and C.M.H. A companion appeal docketed as Cause No. 08-20-00243-CV deals solely with Chad's challenge to the termination of his rights to child D.J.W. Because these companion appeals arise out of the same evidentiary termination hearing, we draw distinctions only to the extent necessary to address specific issues.

## BACKGROUND

At the time of trial, Chad's son D.J.W. was eight years old, his daughter A.L.H. was seven years old, and his daughter C.M.H. was three years old. Amy testified at the trial, but Chad did not testify at the termination trial and made an appearance only through counsel.

At trial, Department Investigator Tonya Perry testified that the Department opened an investigation in March 2019 after law enforcement was called to a home in response to a domestic violence incident. Perry testified that although Amy initially denied domestic violence had occurred, Amy eventually told Perry that on March 5, 2019, Chad had cut her hair, choked her, and caused bruising on her neck, side, and down both her legs. Amy also told Perry that incidents of domestic violence had happened multiple times. Perry observed that Amy's hair had appeared to be cut with a knife and that Amy appeared to be under the influence during the meeting. Perry testified that Amy initially admitted only to use of marijuana, but later admitted to using methamphetamines as well. According to Perry, during a first drug test Amy tested positive for codeine and morphine, and during a second drug test Amy tested positive for marijuana and methamphetamines.

Perry testified that at the time the children were removed, "[t]here was blood all over the walls of the house. The furniture [was] destroyed." Perry stated that when she interviewed the children, they told her they were afraid, that they could hear Amy being hit, and that they locked the bedroom door and hid in a closet to make sure Chad could not get in and hurt them. A.L.H. told Perry that Chad threw her on the bed "where the broken glass and knives were and she was afraid that she was going to get cut up by them[,]" and Perry testified that she observed A.L.H. draw a picture of the fight during a forensic interview where she drew "blood everywhere" including "blood on the walls."

The Department safety plan required Amy to take the children and move in with her parents, while Chad was prohibited from having contact with Amy or the children per a protective order. The children remained with Amy for approximately two or three weeks before they were placed with Maternal Grandparents due to Amy returning to live with Chad.

Perry testified that on March 26, 2019, Amy admitted that she and Chad had gotten back together despite the existence of a protective order and a no-trespass order. Amy also told Perry that she had left the children with Maternal Grandmother while Amy and Chad had gone on a two or three day "meth binge," and she and Chad "used a great deal of methamphetamine over that two or three weeks." Perry testified that Chad refused to undergo drug testing, and that the safety plan for the children had been broken repeatedly.

Department conservatorship supervisor Tori Urbina testified that Amy completed most of the services required of her, but she did not make the life changes necessary to prove that she learned from them and continued to test positive for drug use; Chad had completed fewer services than Amy and not made necessary life changes, either. Chad did not complete individual counseling, and the couples counseling was also not completed. Urbina also testified that Amy and Chad have informed the Department that they do not believe they have an issue being together.

Urbina testified that the children were doing "very well" with their placements, who had bonded with them; D.J.W. and A.L.H. had stated they did not wish to return to Amy and Chad. In contrast, Urbina did not believe Amy or Chad would be able to meet the physical and emotional needs of the children because they were unstable, had made little progress in the 18 months the case had lasted, and continued to downplay the reasons why the Department was involved in the case.

Qualified mental health provider Charlene Quinones testified about the services she

3

provided to A.L.H. and D.J.W. Quinones testified that A.L.H. had trouble managing certain types of situations where she felt cornered or stressed and that she would react by shutting down more with a little bit of aggression, which is common in children who are in domestic violence situations, but that A.L.H. is progressing and had no complaints about the current placement. D.J.W. exhibited more verbally aggressive behavior, defiance, and noncompliance at school, which are also common symptoms for children who have witnessed or experienced domestic violence. D.J.W. had also expressed fears about witnessing violence again or having to feel that he is in charge of protecting his siblings when that violence occurred. Quinones testified that although D.J.W. has struggled and needs medication management, he has progressed since removal.[3]

Lisa Poppen, the staff therapist for the Midland Rape Crisis Trauma Center Child Advocacy of Texas, testified that she performed the trauma assessments for the children in this case. She stated that she believed A.L.H. had post-traumatic stress disorder and that A.L.H. had told her that she had witnessed multiple incidents of domestic violence with a lot of "chaotic arguing, fighting, blood[,]" that she had called 911 many times, and that she had seen alcohol and drugs in the home. Poppen also formed a diagnostic impression that D.J.W. suffered from severe post-traumatic stress disorder, and D.J.W. alleged that his biological mother Andrea and his stepmother Amy had physically abused him. D.J.W. suffered from sleep disturbances, and Poppen testified he was scared because his stepmother Amy and his father Chad had threatened to take him away, which he believed was a credible threat. Poppen testified that the children were doing well in their current placement with the grandparents.

Amy testified that Maternal Grandfather called the police because Chad was assaulting her while she and Chad were both using methamphetamines. According to Amy, Chad choked her,

---

[3] Quinones testified that C.M.H. is too young to receive treatment.

4

and then after she fell asleep and woke up later, she and Chad began arguing again, at which point Chad cut her hair using a knife. She admitted that her children had viewed at least part of the domestic violence.

She testified that she and Chad had separated for a while, but that they had reunited "a couple [of] months ago" and were a couple again and living together. Amy testified she had a plan for exiting her relationship with Chad if domestic violence should happen again, but she did not think it would happen again because without drugs or alcohol, she and Chad "are actually really good together" and there had not been problems or fighting. She acknowledged that her children and stepson had been emotionally damaged by what happened. She testified that the incident was the only big fight between her and Chad, and that Chad had not been the only one who broke things, as she had punched a hole in the wall. She also testified that she was the one who would go out and procure methamphetamine for her and Chad. She testified that she no longer did methamphetamines or marijuana, that her recent drug tests had come back negative, and that she was attending AA and NA meetings.

At the end of the trial, the trial court terminated both Amy and Chad's parental rights. This appeal followed.

## DISCUSSION

In his appeal, Chad contends that the evidence was legally and factually insufficient to support termination on (1) a Subsection (D) environmental endangerment predicate; (2) a Subsection (E) conduct-based endangerment predicate; and (3) a failure to comply with provisions of a court order predicate under Subsection (O).[4]

In her appeal, Amy also challenges the legal and factual sufficiency of the same termination

---

[4] Chad does not challenge the trial court's best interest finding in his brief.

predicate findings under Subsections (D), (E), and (O) as applied to her. She also raises additional challenges to the trial court's findings that termination of her parental rights and naming the Department as the children's managing conservator was in the children's best interest.

We first consider the challenge of the evidence pertaining to Subsections (D) and (E), to determine whether there is legally and factually sufficient evidence to support termination on those grounds before we separately turn to similarly consider the evidence in support of Subsection (O). We then consider Amy's additional contention, that is, whether there is legally and factually sufficient evidence to support the trial court's determination that termination was in the children's best interest.

### *Standard of Review and Applicable Law*

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982) (acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right"). However, although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

Parental rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001. We review parental rights termination appeals under the clear and convincing evidence standard. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). When reviewing the legal sufficiency of the evidence in a termination case,

we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id*. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id*. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *Id*.

In a factual sufficiency review, the inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the challenged findings. *See In re K.A.C.*, 594 S.W.3d 364, 372 (Tex.App.—El Paso 2019, no pet.). We must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *Id*. A court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id*. If the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

To obtain termination of parental rights, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the children. *Id*. at 371. Section 161.001(b)(1) of the Texas Family Code sets out the list of predicates for terminating parental rights. Among those grounds are two that deal specifically with the issue of child endangerment. Although the existence of one predicate ground is sufficient to uphold the termination of parental rights on appeal, the court of appeals must still always review the sufficiency of any findings made under Subsections (D) or

(E) endangerment predicates as part of due process, since those findings can affect a parent's right to be a parent to their other children. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). Since the trial court cited Subsections (D) and (E) as grounds for terminating both Amy and Chad's parental rights, we will begin our analysis with the legal and factual sufficiency of the Subsection (D) and (E) findings.

Under Section 161.001(b)(1)(D), parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" TEX.FAM.CODE ANN. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id*. § 161.001(b)(1)(E).

For both of these provisions, "endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Id*. "It is enough if the youth is exposed to loss or injury or his physical or emotional well-being is jeopardized." *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex.App.—Amarillo 2003, no pet.).

As we previously recognized in *In re B.C.S.*:

Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under Subsection D. Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or

8

surroundings" of the child's home under subsection (D). The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. Thus, subsection (D) addresses *the child's surroundings and environment rather than parental misconduct*, which is the subject of subsection (E).

Under subsection (E), the cause of the danger to the child *must be the parent's conduct alone*, as evidenced not only by the parent's actions but also by the parent's omission or failure to act.

*In re B.C.S.*, 479 S.W.3d 918, 926 (Tex.App.—El Paso 2015, no pet.) (emphasis added) (internal citations omitted).

The relevant inquiry under Subsection (E) is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re K.A.C.*, 594 S.W.3d at 372-73. Termination under this subsection must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. When determining whether a parent has engaged in an endangering course of conduct, a fact finder may consider the parent's actions and inactions that occurred both before and after the child was born, and before and after the child has been removed by the Department. *Id*. The conduct may occur outside the child's presence. *Id*.

### *Environmental and Course-of-Conduct Endangerment*

On this record, evidence is ample to support the endangerment predicate findings as to both Amy and Chad, either under environmental or course-of-conduct predicates.

As we have previously recognized, domestic violence may support a finding of either environmental or course-of-conduct endangerment, depending on the given circumstances. *See In re M.L.L.*, 573 S.W.3d 353, 364 (Tex.App.—El Paso 2019, no pet.) (identifying domestic violence, lack of self-control, and propensity for violence as considerations for evidence of course-of-conduct endangerment predicate); *In re O.E.R.*, 573 S.W.3d 896, 906 (Tex.App.—El Paso 2019,

9

no pet.) (finding parent's choice to continue romantic relationships that exposed child to domestic violence resulting in traumatic emotional harm to child supported environmental endangerment predicate). Here, the evidence would support a finding of either environmental or course-of-conduct endangerment as to either parent.

With respect to Chad, the evidence shows Chad engaged in domestic violence against Amy. Amy testified at trial that in early March 2019, Chad choked her and cut off her hair with a knife, and that the children witnessed at least part of this incident. Perry testified that she observed bruising on Amy's body and "blood all over the walls of the house." Although Amy testified that A.L.H. was lying about there being multiple domestic violence incidents, according to Poppen, A.L.H. disclosed that she did witness multiple incidents of domestic violence with a lot of "chaotic arguing, fighting, blood[,]" had seen alcohol and drugs in the home, and had called 911 many times. D.J.W. also disclosed that he witnessed domestic abuse between Chad and Amy (his stepmother).

Additionally, there is evidence that the incidents of domestic violence affected the children emotionally. Poppen testified that in her professional opinion, A.L.H. and D.J.W. suffered from posttraumatic stress disorder, with D.J.W. exhibiting severe symptoms, including sleep disturbances. The incidents of domestic violence support an endangerment finding against Chad.

As for Amy, Chad's past acts of domestic violence against her may not be considered in the termination of her rights since she was apparently the victim and not the aggressor in these incidents. That said, Amy's actions in later returning to Chad and potentially subjecting the children to further instability—especially given Chad's apparent unwillingness to cooperate with service plan requirements or legal proceedings—is a factor we may consider in making our endangerment assessment as to her, as it demonstrates awareness of the potential for

10

endangerment. *See In re O.E.R.*, 573 S.W.3d at 906 (parent's choice to continue relationship with violent or abusive partners can create an endangering environment for children); *In re S.L.L.*, No. 13-19-00442-CV, 2020 WL 103862, at *6 (Tex.App.—Corpus Christi Jan. 9, 2020, no pet.) (mem. op.) (willingness to tolerate and excuse erratic behavior from a romantic partner at expense of child's physical and emotional well-being may be considered in endangerment analysis).

Likewise, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct" for course-of-conduct endangerment, *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009), as can a parent's failure to complete a service plan. *See In re J.A.V.*, No. 08-20-00181-CV, 2021 WL 302747, at *6 (Tex.App.—El Paso Jan. 29, 2021, no pet.).

These factors weigh against both Chad and Amy. Amy admitted at trial that she and Chad had been using methamphetamines. Perry testified that although Amy initially complied with a safety plan requiring her to take the children and move into the home of the children's grandparents, Amy and the children did eventually go back with Chad in violation of the safety plan. Amy later left the children with their grandparents so that she and Chad could go on a "meth binge." It is undisputed that Chad did not complete a service plan, nor did he comply with drug testing requirements. This evidence of drug abuse bolsters the trial court's endangerment findings against Chad and Amy.

Based on the state of the evidence taken as a whole, we find that the Department established the existence of Subsection (D) and (E) endangerment predicate grounds by clear and convincing evidence. Because we resolve this appeal on Subsection (D) and (E) endangerment grounds, we decline to address Subsection (O) failure to comply with court order grounds as being unnecessary to the final resolution of this appeal. *See* TEX.R.APP.P. 47.1.

11

### *Best Interest*

The existence of a predicate termination ground is not enough to allow a trial court to order termination of parental rights; termination of parental rights must also be in the child's best interest. *See In re B.C.S.*, 479 S.W.3d at 923. A determination of best interest necessitates a focus on the child, not the parent. *See id.* at 927.

There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship, but that presumption may be rebutted. *Id.* Nine non-exhaustive factors should be considered in our analysis of the best interest issue:

1. the child's desires;

2. the child's emotional and physical needs now and in the future;

3. the emotional and physical danger to the child now and in the future;

4. the parenting abilities of the individuals seeking custody;

5. the programs available to assist those individuals to promote the child's best interest;

6. the plans for the child by those individuals or the agency seeking custody;

7. the stability of the home or proposed placement;

8. the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

9. any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) ("the *Holley* factors").

The Department is not required to prove all of the *Holley* factors as a condition precedent to parental-rights termination. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re J.O.C.*, 47 S.W.3d 108, 115

(Tex.App.—Waco 2001, no pet.). We also must bear in mind that permanence is of paramount importance in considering a child's present and future needs. *In re B.C.S.*, 479 S.W.3d at 927.

*Desires of the Children (Factor #1)*

We begin with the desires of the children. Both A.L.H. and D.J.W. have indicated that they do not wish to return to the custody of Chad and Amy. Additionally, as to C.M.H., who at trial was too young to articulate a desire to the trial court, we may consider testimony related to the quality and extent of the child's prospective foster placements. *L.Z. v. Tex. Dep't of Family & Protective Servs.,* No. 03-12-00113-CV, 2012 WL 3629435, at *10 (Tex.App.—Austin Aug. 23, 2012, no pet.) (mem. op.). The testimony at trial generally established that the children were doing well with their new placement. This factor weighs in favor of finding that termination is in the children's best interest.

*Child's Emotional and Physical Needs Now and in the Future (Factor #2)*

We next turn to the emotional and physical needs of the children now and in the future. The record shows that the two older children who are eligible for mental health services have been diagnosed as having post-traumatic stress disorder and need medication management. While Amy generally acknowledged the trauma caused to the children, the record also shows that Amy has tended to downplay the risk toward her children, which raises concerns about her ability to care for children with special emotional needs.

This factor weighs in favor of termination being in the children's best interest.

*Emotional and Physical Danger to the Child / Parental Acts or Omissions Indicating Existing Parent-Child Relationship is Not a Proper One / Excuses for Parent's Acts or Omissions (Factors #3, 8, and 9)*

We group our discussion of Factors #3, 8, and 9 together. As stated previously, the record shows a pattern of drug use and instability, which we may consider in making our assessment

13

under this ground. Although Amy testified that as of trial she had been sober for several months, Amy also reunited with Chad, who was less compliant with the service plan, and the two did not apparently complete couple's counseling. This raises doubts about Amy's and Chad's parenting abilities that the trial court could have considered in making its best interest determination.

On balance, these factors weigh in favor of a finding that termination is in the children's best interest.

### *Parenting Abilities / Programs Available to Assist Individuals to Promote Best Interest (Factors #4 and 5)*

With respect to parenting abilities and the programs available to assist Amy and Chad, the record shows that Amy completed most of her classes, but not all. This weighs slightly in favor of termination being in the children's best interest. The record also shows that Chad was less complaint in adhering to classes than Amy. This factor weighs in favor of termination being in the children's best interest.

### *Stability of the Home of Proposed Placement / Plans for the Children*

The two mental health professionals testified at trial that the children were happy with their new placement and although they still faced challenges, they had shown improvement in their mental health. The evidence also generally showed that the children were doing well in their new placement. On balance, we find that this weighs in favor of termination being in the best interest of the children.

We find the evidence was sufficient under *Holley* to find that termination is in the children's best interest.

### CONCLUSION

14

All of Amy's[5] and Chad's appellate issues that were raised and necessary to final disposition of the appeal are overruled. The judgment of the trial court is affirmed.

GINA M. PALAFOX, Justice

April 19, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

---

[5] In Issue Three, Amy contends the trial court erred by naming the Department as conservator instead of her. Because we affirm the trial court's judgment terminating Amy's parental rights, we have no grounds before us on which to reverse the order naming the Department as conservator. *See Pruitt v. Tex. Dep't of Family & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *9 (Tex.App.—Austin Dec. 23, 2010, no pet.) (mem. op.).